DENNIS ALAN LEMPERT, State Bar Number 42074
LAW OFFICES OF DENNIS ALAN LEMPERT
100 Saratoga Avenue, 1st Floor
Santa Clara, CA 95051-7334

Telephone (408) 249-5152
Fax        (408) 248-5974

Attorneys for Defendant
JOHN CARVALHO DINIZ

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. CR-06-00800-JW |
| | ) | |
| Plaintiffs, | ) | **ADDENDUM BY DEFENDANT TO OPPOSITION TO GOVERNMENT'S RELIANCE ON MR. CARL LEWIS AS ITS SOLE CSAAS EXPERT** |
| v. | ) | |
| | ) | Date: Wednesday, April 30, 2008 |
| JOHN CARVALHO DINIZ, | ) | Time: 9:00 a.m. |
| | ) | Court: Hon. James Ware |
| Defendant. | ) | |
| _____ | ) | |

COMES NOW Defendant JOHN DINIZ, with addendum to opposition to Government's reliance on Mr. Carl Lewis, an investigator, as its sole CSAAS witness.

**A.     THE EXPERTISE OF CARL LEWIS IS LIMITED TO PARROTING THE WORK OF A CLINICIAN DR. ROLAND SUMMIT.**

An expert is entitled to testify as to the expert's opinion with respect to an issue in controversy at trial. Such expert may provide the jury with the basis of his opinion even if the expert relies on the work of other experts and their information to reach his own opinion. However, an expert may not be called to merely parrot the work product of another expert who is not called as a witness.

As was recently articulated by the 10th Circuit in *Lifewise Master Funding*:

> "Rule 702 allows expert testimony only where the 'witness [is] qualified as an expert by knowledge, skill, experience, training, or education' **to offer such opinions**.

LAW OFFICE OF DENNIS ALAN LEMPERT
Telephone (408) 249-5152  Fax (408) 248-5974
100 Saratoga Ave., 1st Fl.
Santa Clara, CA 95051-7334

To qualify as an expert, Mr. Livingston was required to possess 'such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth.' Graham v. Wyeth Labs., 906 F.2d 1399, 1408 (10th Cir. 1990) (quoting Bridger v. Union Ry. Co., 355 F.2d 382, 387 (6th Cir. 1966)). The heart of expert testimony is the foundation. Whether a witness can parrot the results of a model does not mean that he is qualified to explain how the model works or to opine [**29] on the statistical validity or interpretation of the results. See Wilkins v. Univ. of Houston, 662 F.2d 1156, 1157 (5th Cir. Dec. 1981) ('Since multiple regression analysis is subject to misuse, courts cannot be expected to accept at face value conclusions derived from such a model absent expert testimony concerning the validity of the model itself.')" (emphasis added).

*Lifewise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004)(Emphasis added in bold)

**B.** **THE FOUNDATIONAL PREMISE OF CSAAS IS PREDICATED ON A PATIENT DENYING THAT THE PATIENT WAS MOLESTED.**

The five alleged common myths of CSAAS are:

(1) secrecy,

(2) helplessness,

(3) entrapment and accommodation,

(4) delayed, unconvincing disclosure, and

(5) retraction.

Essentially, Dr. Summit encouraged clinicians to lower the specificity of their screening procedures to avoid rejecting a child that might have been molested; i.e., a false negative, due to the myths. Thus, these myths can be expressed as follows:

(1) If a child fails to seek help by reporting an allegation, **that does NOT mean he was NOT molested.**

(2) If a child's allegations of molestation appear to adults to be illogical and incredible, **that does NOT mean he was NOT molested.**

(3) If a male child is outwardly aggressive and exhibits antisocial behavior, **that does NOT mean he was NOT molested.**

(4) If a child delays reporting an allegation of molestation, **that does NOT mean he was NOT molested.**

(5) If a child retracts and allegation of molestation, **that does NOT mean he was NOT**

Law Office of Dennis A. Lempert

Telephone (408) 244-5152 Fax (408) 248-5974

1001 Clark Avenue, Suite B

San Jose, California 95125-7339

**molested.**

As is obvious, the application of Dr. Summit's syndrome is to sensitize clinicians to these five possible myths. None of these 'myths' apply to the facts of the instant case. (See Exhibit A for the full text of Dr. Summit's original article). Further event if such 'myth' factor(s) were present, their only relevance is for clinical treatment and not as a confirmation of the fact of the molestation.

The possibility that a patient dening having been molested should not be denied treatment simply based on the denial of molestations.

**C.     THE GOVERNMENT'S PROPOSED USE OF THIS "SYNDROME" WAS MISSTATED AND MISAPPLIED BY GOVERNMENT'S COUNSEL DURING ORAL ARGUMENT ON MONDAY, APRIL 28, 2008'S HEARING.**

The Government's argument presented on Monday, April 28, 2008 was that Nuno's mother will testify that she observed a sudden change in Nuno's behavior, including rage and outwardly aggressive conduct. Counsel referred the Court to Dr. Summits's discussion of entrapment and accommodation and stated that sub-parts of this section refers the reader to a 'sudden change' in a potential molest victim's behavior including rage and anti-social behavior.  In the section 3 on "Entrapment and Accommodation" Dr. Summit's points out that:

> For many victims of sexual abuse the rage incubates over years of facade, coping, and frustrating, counterfeit attempts at intimacy, only to erupt as a pattern of abuse against offspring in the next generation. The ungratifying, imperfect behavior of the young child and the diffusion of ego boundaries between parent and child invite projection of the bad introject and provide a righteous, impulsive outlet for the explosive rage.

Nowhere else in his writings or otherwise does Dr. Summit describe the onset of 'sudden rage' in relation to sexual molestation. To allow Carl Lewis to pontificate on this matter will allow the jury to misuse the testimony, not to understand some 'myths' respecting child molestation victims behavior. Rather, the jury will misuse the testimony as *confirmatory* evidence to find that Nuno was molested. The latter finding is strictly forbidden to be found from the CSAAS expert's testimony.

**C.     FEDERAL RULES OF EVIDENCE § 403 PRECLUDES THE ADMISSION OF EVIDENCE WHICH IS CONFUSING, MISLEADING**

> **Rule 403.** Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time

**LAW OFFICE OF DENNIS ALAN LEMPERT**
Telephone (408) 249-5152  Fax (408) 248-5
858 University, CA 95

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The Government's contention is that the fact-finder should be permitted to infer from the testimony of Nuno's mother that if there was a change in Nuno's behavior to include rage and outward aggressiveness, at or about the time of the alleged molestation, that he **WAS** molested. That proposition is entirely inconsistent with Dr. Summit's article.

It is predictive. That is, the Government is using the CSAAS evidence to **CORROBORATE** Nuno's allegations that he **WAS** molested. This is completely beyond the scope of CSAAS and, even more importantly, beyond the purported expertise of Carl Lewis.

Of course, the Government attempted to deflect this contention by asserting that they do not intend to argue that correlation and that Carl Lewis will not testify to that effect. However, merely by providing this information to the jury, creates a strong possibility that the jury will draw its own impermissible inferences and conclusions. That patently misleads the jury, is unduly prejudicial to the Defendant, and no curative instruction will "unring the bell".

Metaphorically, like the Siren's song[1] - the enticing appeal of something alluring but potentially dangerous; will cause the jury to "succumb to the siren call of the wilderness" and misuse the presentation of Carl Lewis which is unduly prejudicial.

## CONCLUSION

Without repeating the arguments made by Defendant's counsel yesterday, it is the unfair and inappropriate inferences that a fact-finder might draw from testimony by Carl Lewis about CSAAS that should prevent it from being admitted in this case. None of the five common myths of CSAAS are applicable to this case; again those being, (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed, unconvincing disclosure, or (5) retraction. The fact that the Government

---

[1] They have a pale skin and black or blue hair. Sirens live on small rocky islands, eating human flesh. They lure sailors with their charming songs, then wait until the boat crashes on the rocks.

LAW OFFICE OF DENNIS ALAN LEMPERT

Telephone (408) 249-5152    Facsimile (408) 248-5974

1871 The Alameda, Suite 331-733

has already presented as the basis of its justification for this evidence **being "Entrapment and Accommodation"** while misstating the Dr. Summit's work in that regard, should alone lead this court to deny its admissibility.

Dated: April 29, 2008                    Respectfully submitted

                                         LAW OFFICES OF DENNIS ALAN LEMPERT

                                         _____
                                         DENNIS ALAN LEMPERT
                                         Attorney for Defendant John Diniz

## EXHIBIT A

## THE CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME

ROLAND C., SUMMIT, M.D.

This article was first published in *Child Abuse & Neglect*, Vol. 7, pp. 177-193 (1983).

Head Physician, Community Consultation Service, Clinical Assistant Professor of Psychiatry, Harbor-UCLA Medical Center, Torrance, CA 90509

> Reformatted for the court's convenience.
> Original available upon request.

**ABSTRACT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**SOURCES AND VALIDITY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**THE CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME** . . . . . . . . . . 6
    **1.**   **Secrecy** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    **2.**   **Helplessness** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    **3.**   **Entrapment and Accommodation** . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    **4.**   **Delayed, Conflicted, and Unconvincing Disclosure** . . . . . . . . . . . . . . . 16
    **5.**   **Retraction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**NOTES AND REFERENCES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

LAW OFFICE OF DENNIS A. LEMPERT

Fax (408) 248-2074
Telephone (408) 249-5152
4091 Clerbe-Avenue 951-7337
Santa Clara, CA 95104

## ABSTRACT

Child victims of sexual abuse face **secondary trauma** in the crisis of discovery. Their attempts to reconcile their private experiences with the realities of the outer world are assaulted by the disbelief, blame and rejection they experience from adults.

The normal coping behavior of the child contradicts the entrenched beliefs and expectations typically held by adults, stigmatizing the child with charges of lying, manipulating or imagining from parents, courts and clinicians.

Such abandonment by the very adults most crucial to the child's protection and recovery drives the child deeper into self-blame, self-hate, alienation and revictimization. In contrast, the advocacy of an empathic clinician within a supportive treatment network can provide vital credibility and endorsement for the child.

Evaluation of the responses of normal children to sexual assault provides clear evidence that societal definitions of "normal" victim behavior are inappropriate and procrustean, serving adults as mythic insulators against the child's pain.

Within this climate of prejudice, the sequential survival options available to the victim further alienate the child from any hope of outside credibility or acceptance.

Ironically, the child's inevitable choice of the "wrong" options reinforces and perpetuates the prejudicial myths.

**The most typical reactions of children are classified in this paper as the child sexual abuse accommodation syndrome.** The syndrome is composed of five categories, of which two define basic childhood vulnerability and three are sequentially contingent on sexual assault:

(1) secrecy,
(2) helplessness,
(3) entrapment and accommodation,
(4) delayed, unconvincing disclosure, and
(5) retraction.

The accommodation syndrome is proposed as a simple and logical model for use by clinicians to improve understanding and acceptance of the child's position in the complex and controversial dynamics of sexual victimization.

Application of the syndrome tends to challenge entrenched myths and prejudice, providing credibility and **advocacy** for the child within the home, **the courts**, and throughout the treatment process.

The paper also provides discussion of the child's coping strategies as analogs for subsequent behavioral and psychological problems, including implications for specific modalities of treatment.

## INTRODUCTION

Child sexual abuse has exploded into public awareness during a span of less than five years. More than thirty books [1-34] on the subject have appeared as well as a flood of newspapers, magazines, and television features.

According to a survey conducted by Finkelhor [3,5], almost all American respondents recalled

LAW OFFICE OF DENNIS A. LEMPERT

San Clemente, California 951-881-5159

Telephone (408) 249-5152    Fax (408) 248-5913

some media discussion of child sexual abuse during the previous year.

The summary message in this explosion of information is that sexual abuse of children is much more common and more damaging to individuals and to society than has even been acknowledged by clinical or social scientists.

Support for these assertions comes from first person accounts and from the preliminary findings of specialized sexual abuse treatment programs.

There is an understandable skepticism among scientists and a reluctance to accept such unprecedented claims from such biased samples.

There is also a predictable counter-assertion that while child sexual contacts with adults may be relatively common, the invisibility of such contacts proves that the experience for the child is not uniformly harmful but rather neutral or even beneficial [20,36-40].

Whatever the merits of the various arguments, it should be clear that any child trying to cope with a sexualized relationship with an adult faces an uncertain and highly variable response from whatever personal or professional resources are enlisted for help.

The explosion of interest creates new hazards for the child victim of sexual abuse since it increases the likelihood of discovery but fails to protect the victim against the secondary assaults of an inconsistent intervention system.

The identified child victim encounters an adult world which gives grudging acknowledgment to an abstract concept of child sexual abuse but which challenges and represses the child who presents a specific complaint of victimization.

Adult beliefs are dominated by an entrenched and self-protective mythology that passes for common sense.

"Everybody knows" that adults must protect themselves from groundless accusations of seductive or vindictive young people. An image persists of nubile adolescents playing dangerous games out of their burgeoning sexual fascination.

What everybody does not know, and would not want to know, is that the vast majority of investigated accusations prove valid and that most of the young people were less than eight years old at the time of initiation.

Rather than being calculating or practiced, the child is most often fearful, tentative and confused about the nature of the continuing sexual experience and the outcome of disclosure.

If a respectable, reasonable adult is accused of perverse, assaultive behavior by an uncertain, emotionally distraught child, most adults who hear the accusation will fault the child. Disbelief and rejection by potential adult caretakers increase the helplessness, hopelessness, isolation and self-blame that make up the most damaging aspects of child sexual victimization.

Victims looking back are usually more embittered toward those who rejected their pleas than toward the one who initiated the sexual experiences. When no adult intervenes to acknowledge the reality of the abusive experience or to fix responsibility on the offending adult, there is a reinforcement of the child's tendency to deal with the trauma as an intrapsychic event and to incorporate a monstrous apparition of guilt, self-blame, pain and rage.

**Acceptance and validation are crucial to the psychological survival of the victim.**

A child molested by a father or other male in the role of parent and rejected by the mother is psychologically orphaned and almost defenseless against multiple harmful consequences.

On the other hand, a mother who can advocate for the child and protect against reabuse seems to confer on the child the power to be self-endorsing and to recover with minimum sequellae [22,41].

Without professional or self-help group intervention, most parents are not prepared to believe their child in the face of convincing denials from a responsible adult. Since the majority of adults who molest children occupy a kinship or a trusted relationship [8,22,49,50], the child is put on the defensive for attacking the credibility of the trusted adult, and for creating a crisis of loyalty which defies comfortable resolution.

At a time when the child most needs love, endorsement and exculpation, the unprepared parent typically responds with horror, rejection and blame [22,42].

The mental health professional occupies a pivotal role in the crisis of disclosure. Since the events depicted by the child are so often perceived as incredible, skeptical caretakers turn to experts for clarification. In present practice it is not unusual for clinical evaluation to stigmatize legitimate victims as either confused or malicious.

Often one evaluation will endorse the child's claims and convince prosecutors that criminal action is appropriate, while an adversary evaluation will certify the normalcy of the defendant and convince a judge or jury that the child lied.

In a crime where there is usually no third-party eyewitness and no physical evidence, the verdict, the validation of the child's perception of reality, acceptance by adult caretakers and even the emotional survival of the child may all depend on the knowledge and skill of the clinical advocate.

Every clinician must be capable of understanding and articulating the position of the child in the prevailing adult imbalance of credibility. Without awareness of the child's reality the professional will tend to reflect traditional mythology and to give the stamp of scientific authority to continuing stigmatization of the child.

Clinical study of large numbers of children and their parents in proven cases of sexual abuse provides emphatic contradictions to traditional views. **What emerges is a typical behavior pattern or syndrome of mutually dependent variables which allows for immediate survival of the child within the family but which tends to isolate the child from eventual acceptance, credibility or empathy within the larger society.**

The mythology and protective denial surrounding sexual abuse can be seen as a natural consequence both of the stereotypic coping mechanisms of the child victim and the need of almost all adults to insulate themselves from the painful realities of childhood victimization.

The accommodation process intrinsic to the world of child sexual abuse inspires prejudice and rejection in any adult who chooses to remain aloof from the helplessness and pain of the child's dilemma or who expects that a child should behave in accordance with adult concepts of self-determinism and autonomous, rational choices.

Without a clear understanding of the accommodation syndrome, clinical specialists tend to reinforce the comforting belief that children are only rarely legitimate victims of unilateral sexual abuse and that among the few complaints that surface, most can be dismissed as fantasy, confusion, or a displacement of the child's own wish for power and seductive conquest.

Clinical awareness of the sexual abuse accommodation syndrome is essential to provide a

LAW OFFICE OF DENNIS A.LEMPERT

counterprejudicial explanation to the otherwise self-camouflaging and self-stigmatizing behavior of the victim.

The purpose of this paper then, is to provide a vehicle for a more sensitive, more therapeutic response to legitimate victims of child sexual abuse and to invite more active, more effective clinical advocacy for the child within the family and within the systems of child protection and criminal justice.

## SOURCES AND VALIDITY

This study draws in part from **statistically validated assumptions** regarding prevalence, age relationships and role characteristics of child sexual abuse and in part from correlations and observations that have emerged as self-evident within an extended network of child abuse treatment programs and self- help organizations.

The validity of the accommodation syndrome as defined here has been tested over a period of four years in the author's practice, which specializes in community consultation to diverse clinical and para-clinical sexual abuse programs. The syndrome has elicited strong endorsements from experienced professionals and from victims, offenders and other family members.

Hundreds of training symposia shared with specialists throughout the United States and Canada have reached thousands of individuals who have had personal and/or professional involvement in sexual abuse.

Discussion of the syndrome typically opens a floodgate of recognition of previously uncorollated or disregarded observations.

- Adults who have guarded a shameful secret for a lifetime find permission to remember and to discuss their childhood victimization.
- Family members who have disowned identified victims find a basis for compassion and reunion.
- Children still caught up in secrecy and self-blame find hope for advocacy.
- And professionals who had overlooked indications of sexual abuse find a new capacity for recognition and involvement.

A syndrome should not be viewed as a procrustean bed which defines and dictates a narrow perception of something as complex as child sexual abuse. Just as the choice to sexualize the relationship with a child includes a broad spectrum of adults acting under widely diverse motivations and rationalizations [43], the options for the child are also variable.

A child who seeks help immediately or who gains effective intervention should not be discarded as contradictory, any more than the syndrome should be discarded if it fails to include every possible variant. The syndrome represents a common denominator of the most frequently observed victim behaviors.

In the current state of the art most of the victims available for study are young females molested by adult males entrusted with their care. Young male victims are at least as frequent, just as helpless and even more secretive than young females [9,44,45].

Because of the extreme reluctance of males to admit to sexual victimization experiences and because of the greater probability that a boy will be molested by someone outside the nuclear family, less is known about possible variations in accommodation mechanisms of sexually abused males.

LAW OFFICE OF DENNIS A. LEMPERT
Fax (408) 248-5974
152
San Jose, California 95128-7333

Various aspects of secrecy, helplessness, and self-alienation seem to apply as does an even greater isolation from validation and endorsement by incredulous parents and other adults.

There is an almost universal assumption that a man who molests a boy must be homosexual. Since the habitual molester of boys is rarely attracted to adult males [46], he finds ready exoneration in clinical examination and character endorsements. While there is some public capacity to believe that girls may be helpless victims of sexual abuse, there is almost universal repudiation of the boy victim.

For the sake of brevity and clarity the child sexual abuse accommodation syndrome is presented in this paper as it applies to the most typical female victim. There is no intent to minimize nor to exclude the substantial hardships of male victims or to ignore the conspicuously small minority of offenders who are female. A more comprehensive discussion of role variants within an extended syndrome is presented elsewhere [47].

In the following discussion the feminine pronoun is used generically for the child rather than the more cumbersome he/she. This convention is not meant to discourage application of the accommodation syndrome to male victims or to the shared experience of males and female co-victims wherever clinical experience indicates appropriate correlations.

**THE CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME**

The syndrome includes five categories, two of which are preconditions to the occurrence of sexual abuse. The remaining three categories are sequential contingencies which take on increasing variability and complexity.

While it can be shown that each category reflects a compelling reality for the victim, each category represents also a contradiction to the most common assumptions of adults. The five categories of the syndrome are:

1. Secrecy
2. Helplessness
3. Entrapment and accommodation
4. Delayed, conflicted and unconvincing disclosure
5. Retraction

   **1.   Secrecy**
Initiation, intimidation, stigmatization, isolation, helplessness and self-blame depend on a terrifying reality of child sexual abuse: It happens only when the child is alone with the offending adult, and it must never be shared with anyone else.

Virtually no child is prepared for the possibility of molestation by a trusted adult; that possibility is a well kept secret even among adults. The child is, therefore, entirely dependent on the intruder for whatever reality is assigned to the experience.

Of all the inadequate, illogical, self-serving, or self- protective explanations provided by the adult, the only consistent and meaningful impression gained by the child is one of danger and fearful outcome based on secrecy [22,48].

- "This is our secret; nobody else will understand."
- "Don't tell anybody."
- "Nobody will believe you."
- "Don't tell your mother;

**DEFENDANT'S OPPOSITION TO GOVERNMENT'S RELIANCE ON MR. CARL LEWIS AS ITS SOLE CSAAS EXPERT**

(a)   she will hate you,
(b)   she will hate me,
(c)   she will kill you,
(d)   she will kill me,
(e)   it will kill her,
(f)   she will send you away,
(g)   she will send me away, or
(h)   it will break up the family and you'll all end up in an orphanage."

•   "If you tell anyone:

(a)   I won't love you anymore,
(b)   I'll spank you,
(c)   I'll kill your dog, or
(d)   I'll kill you."

However gentle or menacing the intimidation may be, **the secrecy makes it clear to the child that this is something bad and dangerous.**

**The secrecy is both the source of fear and the promise of safety:** "Everything will be all right if you just don't tell."

The secret takes on magical, monstrous proportions for the child. A child with no knowledge or awareness of sex and even with no pain or embarrassment from the sexual experience itself will still be stigmatized with a sense of badness and danger from the pervasive secrecy.

Any attempts by the child to illuminate the secret will be countered by an adult conspiracy of silence and disbelief:

•   "Don't worry about things like that; that could never happen in our family."
•   "Nice children don't talk about things like that."
•   "Uncle Johnnie doesn't mean you any harm; that's just his way of showing how he loves you."
•   "How could you ever think of such a terrible thing?"
•   "Don't let me ever hear you say anything like that again!"

The average child never asks and never tells. Contrary to the general expectation that the victim would normally seek help, the majority of the victims in retrospective surveys had never told anyone during their childhood [22,42,49,50].

Respondents expressed fear that they would be blamed for what had happened or that a parent would not be able to protect them from retaliation. Many of those who sought help reported that parents became hysterical or punishing or pretended that nothing had happened [42].

Yet adult expectation dominates the judgment applied to disclosures of sexual abuse. When the child does not immediately complain, it is painfully apparent to any child that there is no second chance.

•   "Why didn't you tell me?"
•   "How could you keep such a thing secret?"
•   "What are you trying to hide?"

LAW OFFICE OF DENNIS A. LEMPERT

Telephone (408) 249-5152  Fax (408) 248-5974

Santa Clara, CA 95050

408-Lincoln Avenue 51-7337

- "Why did you wait until now if it really happened so long ago?"
- "How can you expect me to believe such a fantastic story?"

Unless the victim can find some permission and power to share the secret and unless there is the possibility of an engaging, non-punitive response to disclosure, the child is likely to spend a lifetime in what comes to be a self-imposed exile from intimacy, trust and self-validation.

**2. Helplessness**

The adult expectation of child self-protection and immediate disclosure ignores the basic subordination and helplessness of children within authoritarian relationships.

Children may be given permission to avoid the attentions of strangers, but they are required to be obedient and affectionate with any adult entrusted with their care.

Strangers, "weirdos," kidnappers, and other monsters provide a convenient foil for both child and parent against a much more dreadful and immediate risk: the betrayal of vital relationships, abandonment by trusted caretakers and annihilation of basic family security.

All available research is remarkably consistent in a discomforting statistic: a child is three times more likely to be molested by a recognized, trusted adult than by a stranger [9,42,44,50].

The risk is not at all remote. Even the most conservative survey implies that about 10% of all females have been sexually victimized as children by an adult relative, including almost 2% involving the man in the role of father [42].

The latest and most representative survey reports a 16% prevalence of molestation by relatives. Fully 4.6% of the 930 women interviewed reported an incestuous relationship with their father or father-figure [50].

A corollary to the expectation of self-protection is the general assumption that uncomplaining children are acting in a consenting relationship. This expectation is dubious even for the mythic seductive adolescent.

Given the assumption that an adolescent can be sexually attractive, seductive and even deliberately provocative, it should be clear that no child has equal power to say no to a parental figure or to anticipate the consequences of sexual involvement with an adult caretaker.

Ordinary ethics demand that the adult in such a mismatch bear sole responsibility for any clandestine sexual activity with a minor [51].

In reality, though, the child partner is most often neither sexually attractive nor seductive in any conventional sense. The stereotype of the seductive adolescent is an artifact both of delayed disclosure and a prevailing adult wish to define child sexual abuse within a model that approximates logical adult behavior.

We can believe that a man might normally be attracted to a nubile child-woman. Only perversion could explain attraction to an undeveloped girl or boy, and the men implicated in most ongoing sexual molestations are quite obviously not perverted. They tend to be hardworking, devoted family men. They may be better educated, more law-abiding, and more religious than average.

F:\APPS\WORDPERF\Diniz, John\Trial\In Limine Motions\CSAAS-Diniz.wpd
**DEFENDANT'S OPPOSITION TO GOVERNMENT'S RELIANCE ON MR. CARL LEWIS AS ITS SOLE CSAAS EXPERT**

Page 7

As clinical experience in child sexual intervention has increased, the reported age of initiation has decreased.

- In 1979, a typical average was a surprisingly prepubescent nine years.
- By 1981, the federally funded national training models reported the average age of initiation as seven years [52].

At the Harborview Sexual Assault Center in Seattle, 25% of the children presenting for treatment are five years of age or younger [53].

The prevailing reality for the most frequent victim of child sexual abuse is not a street or schoolground experience and not some mutual vulnerability to oedipal temptations, but an unprecedented, relentlessly progressive intrusion of sexual acts by an overpowering adult in a one-sided victim-perpetrator relationship.

The fact that the perpetrator is often in a trusted and apparently loving position only increases the imbalance of power and underscores the helplessness of the child.

Children often describe their first experiences as waking up to find their father (or stepfather, or mother's live-in companion) exploring their bodies with hands or mouth.

Less frequently, they may find a penis filling their mouth or probing between their legs. Society allows the child one acceptable set of reactions to such an experience. Like the adult victim of rape, the child victim is expected to forcibly resist, to cry for help and to attempt to escape the intrusion. By that standard, almost every child fails.

The normal reaction is to "play possum," that is to feign sleep, to shift position and to pull up the covers. Small creatures simply do not call on force to deal with overwhelming threat. When there is no place to run, they have no choice but to try to hide. Children generally learn to cope silently with terrors in the night. Bed covers take on magical powers against monsters, but they are no match for human intruders.

It is sad to hear children attacked by attorneys and discredited by juries because they claimed to be molested yet admitted they had made no protest nor outcry.

The point to emphasize here is not so much the miscarriage of justice as the continuing assault on the child. If the child's testimony is rejected in court, there is more likely to be a rejection by the mother and other relatives who may be eager to restore trust in the accused adult and to brand the child as malicious.

Clinical experience and expert testimony can provide advocacy for the child. Children are easily ashamed and intimidated both by their helplessness and by their inability to communicate their feelings to uncomprehending adults. **They need an adult clinical advocate to translate the child's world into an adult-acceptable language.**

The intrinsic helplessness of a child clashes with the cherished adult sense of free will. Adults need careful guidance to risk empathizing with the absolute powerlessness of the child; they have spent years repressing and distancing themselves from that horror. Adults tend to despise helplessness and to condemn

F:\APPS\WORDPERF\Diniz, John\Trial\In Limine Motions\CSAAS-Diniz.wpd
**DEFENDANT'S OPPOSITION TO GOVERNMENT'S RELIANCE ON MR. CARL LEWIS AS ITS SOLE  CSAAS EXPERT**

Page 8

anyone who submits too easily to intimidation.

A victim will be judged as a willing accomplice unless compliance was achieved through overwhelming force or threat of violence. Adults must be reminded that the wordless action or gesture of a parent is an absolutely compelling force for a dependent child and the threat of loss of love or loss of family security is more frightening to the child than any threat of violence.

Questions of free will and compliance are not just legal rhetoric. It is necessary for the emotional survival of the child that adult custodians give permission and endorsement to the helplessness and noncomplicity of the initiate's role. Adult prejudice is contagious.

Without a consistent therapeutic affirmation of innocence, the victim tends to become filled with self-condemnation and self-hate for somehow inviting and allowing the sexual assaults.

As an advocate for the child, both in therapy and in court, it is necessary to recognize that no matter what the circumstances, the child had no choice but to submit quietly and to keep the secret. No matter if mother was in the next room or if siblings were asleep in the same bed. **The more illogical and incredible the initiation scene might seem to adults, the more likely it is that the child's plaintive description is valid.**

A caring father would not logically act as the child describes; if nothing else, it seems incredible that he would take such flamboyant risks. That logical analysis contains at least two naive assumptions:

(1)     the molestation is thoughtful and
(2)     that it is risky.

Molestation of a child is not a thoughtful gesture of caring, but a desperate, compulsive search for acceptance and submission [54].

There is very little risk of discovery if the child is young enough and if there is an established relationship of authority and affection. Men who seek children as sexual partners discover quickly something that remains incredible to less impulsive adults: **dependent children are helpless to resist or to complain.**

A letter to Ann Landers illustrates very well the continuing helplessness and pervasive secrecy associated with incestuous abuse:

Dear Ann:

Last week my 32-year-old sister told me she had been sexually molested by our father from age 6 to 16. I was stunned because for 20 years I had kept the same secret from anyone. I am now 30. We decided to talk to our three other sisters, all in their 20's. It turned out that our father had sexually molested each and every one of us. We all thought we were being singled out for that humiliating, ugly experience, and we were too ashamed and frightened to tell anyone, so we all kept our mouths shut.

Father is now 53. To look at him, you would think he was the all-American dad. Mom is 51. She would die if she had any idea of what he had been doing to his

LAW OFFICE OF DENNIS A. LEMPERT

Telephone (408) 249-5152   Fax (408) 248-5974

Santa Clara, CA 95051-7337

**DEFENDANT'S OPPOSITION TO GOVERNMENT'S  RELIANCE ON MR. CARL LEWIS AS ITS SOLE  CSAAS EXPERT**

daughters all these years [55].

**3.    Entrapment and Accommodation**
For the child within a dependent relationship sexual molestation is not typically a onetime occurrence.

The adult may be racked with regrets, guilt, fear and resolutions to stop, but the forbidden quality of the experience and the unexpected ease of accomplishment seem to invite repetition.

A compulsive, addictive pattern tends to develop which continues either until the child achieves autonomy or until discovery and forcible prohibition overpower the secret [22].

If the child did not seek or did not receive immediate protective intervention, there is no further option to stop the abuse. The only healthy option left for the child is to. learn to accept the situation and to survive. There is no way out, no place to run. The healthy, normal, emotionally resilient child will learn to accommodate to the reality of continuing sexual abuse.

There is the challenge of accommodating not only to escalating sexual demands but to an increasing consciousness of betrayal and objectification by someone who is ordinarily idealized as a protective, altruistic, loving parental figure.

Much of what is eventually labeled as adolescent or adult psychopathology can be traced to the natural reactions of a healthy child to a profoundly unnatural and unhealthy parental environment.

Pathological dependency, self-punishment, self- mutilation, selective restructuring of reality and multiple personalities, to name a few, represent habitual vestiges of painfully learned childhood survival skills.

In dealing with the accommodation mechanisms of the child or the vestigial scars of the adult survivor, the therapist must take care to avoid reinforcing a sense of badness, inadequacy or craziness by condemning or stigmatizing the symptoms.

The child faced with continuing helpless victimization must learn to somehow achieve a sense of power and control. The child cannot safety conceptualize that a parent might be ruthless and self-serving; such a conclusion is tantamount to abandonment and annihilation.

The only acceptable alternative for the child is to believe that she has provoked the pain encounters to hope that by learning to go along she can earn love and acceptance.

The desperate assumption of responsibility and the inevitable failure to earn relief set the foundation for self-hate and what Shengold describes as a vertical split in reality testing.

If the very parent who abuses and is experienced as bad must be turned to for relief of the distress that the parent has caused, then the child must, out of desperate need, register the parent - *delusionally* - as good.

Only the mental image of a good parent can help the child deal with the terrifying

**DEFENDANT'S OPPOSITION TO GOVERNMENT'S  RELIANCE ON MR. CARL LEWIS AS ITS SOLE  CSAAS EXPERT**

Page 16

intensity of fear and rage which is the effect of the tormenting experiences.

The alternative - the maintenance of the overwhelming stimulation and the bad parental imago - means annihilation of identity, of the ling of the self. So the bad has to be registered as good. This is a mind-splitting or a mind fragmenting operation [56].

Shengold's use of the word *delusionally* does not assume a psychotic process or a defect in perception, but rather the practiced ability to reconcile contradictory realities. As he continues later on the same page,

> I am not describing schizophrenia ... but the establishment of
> isolated divisions of the mind that provides the mechanism
> for a pattern in which contradictory images of the self and of
> the parents are never permitted to coalesce. (This
> compartmentalized 'vertical splitting' transcends diagnostic
> categories; I am deliberately avoiding bringing in the
> correlatable pathological formations of Winnicott, Kohut,
> and Kernberg.) [56].

The sexually abusing parent provides graphic example and instruction in how to be good, that is, the child must be available without complaint to the parent's sexual demands.

There is an explicit or implicit promise of reward. If she is good and if she keeps the secret, she can:

• protect her siblings from sexual involvement ("It's a good thing I can count on you to love me; otherwise I'd have to turn to your little sister"),

• protect her mother from disintegration ("If your mother ever found out, it would kill her"),

• protect her father from temptation ("If I couldn't count on you, I'd have to hang out in bars and look for other women")

• and, most vitally, preserve the security of the home ("If you ever tell, they could send me to jail and put all you kids in an orphanage").

In the classic role reversal of child abuse, the child is given the power to destroy the family and the responsibility to keep it together. The child, *not the parent*, must mobilize the altruism and self-control to insure the survival of the others.

The child, in short, must secretly assume many of the role-functions ordinarily assigned to the mother.

There is an inevitable splitting of conventional moral values. Maintaining a lie to keep the secret is the ultimate virtue, while telling the truth would be the greatest sin. A child thus victimized will appear to accept or to seek sexual contact without complaint.

Since the child must structure her reality to protect the parent, she also finds the means to build pockets of survival where some hope of goodness can find sanctuary.

- She may turn to imaginary companions for reassurance.
- She may develop multiple personalities, assigning helplessness and suffering to one, badness and rage to another, sexual power to another, love and compassion to another, etc.
- She may discover altered states of consciousness to shut off pain or to dissociate from her body, as if looking on from a distance at the child suffering the abuse.

The same mechanisms which allow psychic survival for the child become handicaps to effective psychological integration as an adult.

If the child cannot create a psychic economy to reconcile the continuing outrage, the intolerance of helplessness and the increasing feeling of rage will seek active expression.

For the girl this often leads to self-destruction and reinforcement of self-hate; self-mutilation, suicidal behavior, promiscuous sexual activity and repeated runaways are typical.

- She may learn to exploit the father for privileges, favors and material rewards, reinforcing her self-punishing image as "whore" in the process.

- She may fight with both parents, but her greatest rage is likely to focus on her mother, whom she blames for abandoning her to her father. She assumes that her mother must know of the sexual abuse and is either too uncaring or too ineffectual to intervene.

Ultimately the child tends to believe that she is intrinsically so rotten that she was never worth caring for. The failure of the mother-daughter bond reinforces the young woman's distrust of herself as a female and makes her all the more dependent on the pathetic hope of gaining acceptance and protection with an abusive male.

For many victims of sexual abuse the rage incubates over years of facade, coping, and frustrating, counterfeit attempts at intimacy, only to erupt as a pattern of abuse against offspring in the next generation. The ungratifying, imperfect behavior of the young child and the diffusion of ego boundaries between parent and child invite projection of the bad introject and provide a righteous, impulsive outlet for the explosive rage.

The male victim of sexual abuse is more likely to turn his rage outward in aggressive and antisocial behavior. He is even more intolerant of his helplessness than the female victim and more likely to rationalize that he is exploiting the relationship for his own benefit. He may cling so tenaciously to an idealized relationship with the adult that he remains fixed at a preadolescent level of sexual object choice, as if trying to keep love alive with an unending succession of young boys.

Various admixtures of depression, counterphobic violence, mysogyny (again, the mother is seen as non-caring and unprotective), child molestation and rape seem to be part of the legacy of rage endowed in the sexually abused boy [45].

Substance abuse is an inviting avenue of escape for the victim of either gender. As Myers recalls: "On drugs, I could be anything I wanted to be. I could make up my

LAW OFFICE OF DENNIS ALAN LEMPERT

Telephone (408) 249-5152  Fax (408) 248-5974

4008 Stone Way Avenue
Santa Clara, CA 95051-7337

own reality: I could be pretty, have a good family, a nice father, a strong mother, and be happy ... drinking had the opposite effect of drugs ... Drinking got me back into my pain; it allowed me to experience my hurt and my anger" [57].

It is worth restating that all these accommodation mechanisms - domestic martyrdom, splitting of reality, altered consciousness, hysterical phenomena, delinquency, sociopathy, projection of rage, even self-mutilation - are part of the survival skills of the child. They can be overcome only if the child can be led to trust in a secure environment which can provide consistent, *noncontingent* acceptance and caring.

In the meantime, anyone working therapeutically with the child (or the grown-up, still-shattered victim) may be tested and provoked to prove that trust is impossible [22], and that the only secure reality is negative expectations and self-hate.

It is all too easy for the would-be therapist to join the parents and all of adult society in rejecting such a child, looking at the results of abuse to assume that such an "impossible wretch" must have asked for and deserved whatever punishment had occurred, if indeed the whole problem is not a hysterical or vengeful fantasy.

**4.      Delayed, Conflicted, and Unconvincing Disclosure**
Most ongoing sexual abuse is never disclosed, at least not outside the immediate family [8,22,49,50].

Treated, reported or investigated cases are the exception, not the norm. Disclosure is an outgrowth either of overwhelming family conflict, incidental discovery by a third party, or sensitive outreach and community education by child protective agencies.

If family conflict triggers disclosure, it is usually only after some years of continuing sexual abuse and an eventual breakdown of accommodation mechanisms. The victim of incestuous abuse tends to remain silent until she enters adolescence when she becomes capable of demanding a more separate life for herself and challenging the authority of her parents.

Adolescence also makes the father more jealous and controlling, trying to sequester his daughter against the "dangers" of outside peer involvement. The corrosive effects of accommodation seem to justify any extreme of punishment.

What parent would not impose severe restrictions to control running away, drug abuse, promiscuity, rebellion and delinquency?

After an especially punishing family fight and a belittling showdown of authority by the father, the girl is finally driven by anger to let go of the secret. *She seeks understanding and intervention at the very time she is least likely to find them.*

Authorities are alienated by the pattern of delinquency and rebellious anger expressed by the girl.

Most adults confronted with such a history tend to identify with the problems of the parents in trying to cope with a rebellious teenager.

•      They observe that the girl seems more angry about the immediate punishment than about the sexual atrocities she is alleging.

F:\APPS\WORDPERF\Diniz, John\Trial\In Limine Motions\CSAAS-Diniz.wpd
**DEFENDANT'S OPPOSITION TO GOVERNMENT'S  RELIANCE ON MR. CARL LEWIS AS ITS SOLE  CSAAS EXPERT**
Page 1

- They assume there is no truth to such a fantastic complaint, especially since the girl did not complain years ago when she claims she was forcibly molested.

- They assume she has invented the story in retaliation against the father's attempts to achieve reasonable control and discipline.

The more unreasonable and abusive the triggering punishment, the more they assume the girl would do anything to get away, even to the point of falsely incriminating her father.

Unless specifically trained and sensitized, average adults, including mothers, relatives, teachers, counselors, doctors, psychotherapists, investigators, prosecutors, defense attorneys, judges and jurors, cannot believe that a normal, truthful child would tolerate incest without immediately reporting or that an apparently normal father could be capable of repeated, unchallenged sexual molestation of his own daughter.

The child of any age faces an unbelieving audience when she complains of ongoing sexual abuse. The troubled, angry adolescent risks not only disbelief, but scapegoating, humiliations and punishment as well.

Not all complaining adolescents appear angry and unreliable. An alternative accommodation pattern exists in which the child succeeds in hiding any indications of conflict.

Such a child may be unusually achieving and popular, eager to please both teachers and peers. When the honor student or the captain of the football team tries to describe a history of ongoing sexual involvement with an adult, the adult reaction is all the more incredulous.

- "How could such a thing have happened to such a fine young person?"
- "No one so talented and well-adjusted could have been involved in something so sordid."

Obviously, it did not happen or, if it did, it certainly did not harm the child.

So there is no real cause for complaint. Whether the child is delinquent, hypersexual, countersexual, suicidal, hysterical, psychotic, or perfectly well-adjusted, and whether the child is angry, evasive or serene, the immediate affect and the adjustment pattern of the child will be interpreted by adults to invalidate the child's complaint.

Contrary to popular myth most mothers are not aware of ongoing sexual abuse. Marriage demands considerable blind trust and denial for survival. A woman does not commit her life and security to a man she believes capable of molesting his own children.

The "obvious" clues to sexual abuse are usually obvious only in retrospect.

Our assumption that the mother "must have known" merely parallels the demand of the child that the mother must be in touch intuitively with invisible and even deliberately concealed family discomfort.

The mother typically reacts to allegations of sexual abuse with disbelief and protective denial.

- How could she not have known?
- How could the child wait so long to tell her?
- What kind of mother could allow such a thing to happen?
- What would the neighbors think?

As someone substantially dependent on the approval and generosity of the father, the mother in the incestuous triangle is confronted with a mind- splitting dilemma analogous to that of the abused child. Either the child is bad and deserving of punishment or the father is bad and unfairly punitive. One of them is lying and unworthy of trust.

The mother's whole security and life adjustment and much of her sense of adult self-worth demand a trust in the reliability of her partner. To accept the alternative means annihilation of the family and a large piece of her own identity. Her fear and ambivalence are reassured by the father's logical challenge:

- "Are you going to believe that lying little slut? Can you believe I would do such a thing?
- How could something like that go on right under your nose for years?
- You know we can't trust her out of our sight anymore. Just when we try to clamp down and I get a little rough with her, she comes back with a ridiculous story like this.
- That's what I get for trying to keep her out of trouble."

Of the minority of incest secrets that are disclosed to the mother or discovered by the mother, very few are subsequently reported to outside agencies [50]. The mother will either disbelieve the complaint or try to negotiate a resolution within the family.

Now that professionals are required to report any suspicion of child abuse, increasing numbers of complaints are investigated by protective agencies.

Police investigators and protective service workers are likely to give credence to the complaint, in which case all the children may be removed immediately into protective custody pending hearing of a dependency petition.

In the continuing paradox of a divided judicial system, the juvenile court judge is likely to sustain out-of-home placement in the "preponderance of the evidence" that the child is in danger, while no charges are even filed in the adult court which would consider the father's criminal responsibility.

**Attorneys know that the uncorroborated testimony of a child will not convict a respectable adult. The test in criminal court requires specific proof "beyond a reasonable doubt," and every reasonable adult juror will have reason to doubt the child's fantastic claims.**

Prosecutors are reluctant to subject the child to humiliating cross-examination just as they are loath to prosecute cases they cannot win. Therefore, they typically reject the complaint on the basis of insufficient evidence.

Out-of-family molesters are also effectively immune from incrimination if they have

any amount of prestige. Even if several children have complained, their testimony will be impeached by trivial discrepancies in their accounts or by the countercharge that the children were willing and seductive conspirators.

The absence of criminal charges is tantamount to a conviction of perjury against the victim. "A man is innocent until proven guilty," say adult-protective relatives. "The kid claimed to be molested but there was nothing to it. The police investigated and they didn't even file charges."

**Unless there is expert advocacy for the child in the criminal court, the child is likely to be abandoned as the helpless custodian of a self-incriminating secret which no responsible adult can believe.**

The psychiatrist or other counseling specialist has a crucial role in early detection, treatment intervention and expert courtroom advocacy.

The specialist must help mobilize skeptical caretakers into a position of belief, acceptance, support and protection of the child.

The specialist must first be capable of assuming that same position. The counselor who learns to accept the secrecy, the helplessness, the accommodation and the delayed disclosure may still be alienated by the fifth level of the accommodation syndrome.

5. **Retraction**
*Whatever a child says about sexual abuse, she is likely to reverse it.* Beneath the anger of impulsive disclosure remains the ambivalence of guilt and the martyred obligation to preserve the family.

In the chaotic aftermath of disclosure, the child discovers that the bedrock fears and threats underlying the secrecy are true.

- Her father abandons her and calls her a liar.

- Her mother does not believe her or decompensates into hysteria and rage.

- The family is fragmented, and all the children are placed in custody.

- The father is threatened with disgrace and imprisonment.

- The girl is blamed for causing the whole mess, and everyone seems to treat her like a freak. She is interrogated about all the tawdry details and encouraged to incriminate her father, yet the father remains unchallenged, remaining at home in the security of the family. She is held in custody with no apparent hope of returning home if the dependency petition is sustained.

The message from the mother is very clear, often explicit. "Why do you insist on telling those awful stories about your father? If you send him to prison, we won't be a family anymore. We'll end up on welfare with no place to stay. Is that what you want to do to us?"

Once again, the child bears the responsibility of either preserving or destroying the family. The role reversal continues with the "bad" choice being to tell the truth and the "good" choice being to capitulate and restore a lie for the sake of the family.

*Unless there is special support for the child and immediate intervention to force responsibility on the father, the girl will follow the normal course and retract her complaint.* The girl "admits" she made up the story. "I was awful mad at my dad for punishing me. He hit me and said I could never see my boyfriend again. I've been really bad for years and nothing seems to keep me from getting into trouble. Dad had plenty of reason to be mad at me. But I got real mad and just had to find some way of getting out of that place. So I made up this story about him fooling around with me and everything. I didn't mean to get everyone in so much trouble."

This simple lie carries more credibility than the most explicit claims of incestuous entrapment. It confirms adult expectations that children cannot be trusted. It restores the precarious equilibrium of the family. The children learn not to complain. The adults learn not to listen. And the authorities learn not to believe rebellious children who try to use their sexual power to destroy well-meaning parents.

**DISCUSSION**
It should be obvious that, left unchallenged, the sexual abuse accommodation syndrome tends to reinforce both the victimization of children and societal complacency and indifference to the dimensions of that victimization.

It should be obvious to clinicians that the power to challenge and to interrupt the accommodation process carries an unprecedented potential for primary prevention of emotional pain and disability, including an interruption in the intergenerational chain of child abuse.

What is not so obvious is that mental health specialists may be more skeptical of reports of sexual abuse and more hesitant to involve themselves as advocates for children than many professionals with less specific training. The apparent cause-and-effect relationships and the emphasis on unilateral intrusions by powerful adults may seem naive and regressive to anyone trained in more sophisticated family dynamics, where events are viewed as an equilibrium of needs and provocations within the system as a whole [58].

Freud led a trend from the victim-perpetrator concept to a more universal and intellectually stimulating view in 1897 when he renounced his own child seduction theory of hysteria for the seductive child thesis of the Oedipus complex [16,59-61].

Even if a substantial number of descriptions of sexual victimization prove to be valid, how can they be distinguished from those that should be treated as fantasy or deception? Rosenfeld [62] has addressed these questions in a general sense but a nagging uncertainty persists.

**The victim of child sexual abuse is in a position somewhat analogous to that of the adult rape victim prior to 1974.** Without a consistent clinical understanding of the psychological climate and adjustment patterns of rape, women were assumed to be provocative and substantially responsible for inviting or exposing themselves to the risk of attack. The fact that most women chose not to report their own victimization only confirmed the unchallenged suspicion that they had something to hide. Those who reported often regretted their decision as they found themselves subjected to repeated attacks on their character and credibility.

The turnaround for adult victims came with publication of a landmark paper in the clinical literature during a time of aroused protest led by the women's movement. *Rape Trauma Syndrome* by Burgess and Holmstrom appeared in 1974 [63]. It provided guidelines for recognition and management of the traumatic psychological sequellae and established a logical sequence of the victim's shame, self-blame, and secrecy which so typically camouflaged the attack. Its publication initiated what proved to be a trend toward more sympathetic reception of rape

1    victims both in clinics and in courts.

2    A similar reception is long overdue for juvenile victims [24]. Ironically, the same clinical study that
3    defined the rape trauma syndrome led the authors to describe a related set of circumstances
   observed in children treated within the Boston Hospital Victim Counseling Program. *Sexual*
4    *Trauma of Children and Adolescents: Pressure, Sex and Secrecy* was published in 1975 [64].

5    The first paragraph concludes: "The emotional reactions of victims result from their being
   pressured into sexual activity and from the added tension of keeping the act secret. "

6    The narrative describes the elements of helplessness and the pressure to maintain secrecy. The fear
   of rejection and disbelief is documented by poignant clinical vignettes as are several mechanisms
7    of accommodation and the traumatic effects of unsupported disclosure. The discussion challenges
   earlier studies indicating willing or seductive participation.

8

9        In reviewing our data on child and adolescent victims, we have tried to avoid
       traditional ways of viewing the problem and instead to describe, from the victim's
10        point of view, the dynamics involved between offender and victim regarding the
       issues of inability to consent, adaptive behavior, secrecy, and the disclosure of the
11        secret ... Our data clearly indicates that a syndrome of symptom reaction is the
       result of pressure to keep the activity secret as well as the result of the disclosure
12        ... It may be speculated that there are many children with silent reaction to sexual
       trauma. The child who responds to the pressure to go along with the sexual activity
       with adults may be viewed as showing an adaptive response for survival in the
13        environment [65].

14    If there had been an aroused protest for protection of children in 1975, the vanguard observations
15    of Burgess and Holmstrom might have marked a turnaround for more sympathetic reception of
   child victimization.

16    Since child advocacy suffers in competition with adult interests, there has been at best an
   evolutionary rather than a revolutionary response within the clinical and judicial fields.

17    It is, therefore, appropriate to recall the rape trauma syndrome as a model for increasing the
18    sensitivity of counselors and of legal counselors and to restate the sexual trauma of children and
   adolescents as seen with an additional eight years of **multiagency experience** and nationwide
19    correlation.

20    ## CONCLUSION

21    Sexual abuse of children is not a new phenomenon although its true dimensions are emerging only
   through recent awareness and study.

22

23    Children have been subject to molestation, exploitation and intimidation by supposed caretakers
   throughout history [66].

24    What is changing most in our present generation is the sensitivity to recognize exploitation, to
25    identify blatant inequities in parenting among otherwise apparently adequate families, and to
   discover that such inequities have a substantial impact on the character development, personality
26    integration and emotional well-being of the more deprived and mistreated children.

27    Freud could find no precedent in 1897 for any number of respectable parents victimizing their
   children. "Then there was the astonishing thing that in every case ... blame was laid on perverse
28    acts by the father, and the realization of the unexpected frequency of hysteria, in every case of

LAW OFFICE OF DENNIS A.N. LEMPERT
phone (408) 5___ fax (408) 5___
___ S. AGUSTIN CA ___

which the same applied, though it was hardly credible that perverted acts against children were so general" [67].

In the 1980's we can no longer afford to be incredulous of basic realities of child abuse. The growing body of literature emanating from the now classic paper, *The Battered Child Syndrome* [68], published in 1962, gives ample precedent and a 20 year perspective for the certain recognition that perverted acts against children are, in fact, so general.

Sexual molestation was called the last frontier in child abuse in 1975 by Sgroi, an internist, who was already in a position to identify the reluctance of many clinicians to accept the problem [69].

> *Recognition of sexual molestation in a child is entirely dependent on the individual's inherent willingness to entertain the possibility that the condition may exist.* Unfortunately, willingness to consider the diagnosis of suspected child sexual molestation frequently seems to vary in inverse proportion to the individual's level of training. That is, the more advanced the training of some, the less willing they are to suspect molestation.

It is urgent in the interests both of treatment and of legal advocacy and for the sake of primary, secondary and tertiary prevention of diverse emotional disabilities that clinicians in every field of the behavioral sciences be more aware of child sexual abuse.

It is countertherapeutic and unjust to expose legitimate victims to evaluations or treatment by therapists who cannot 'Suspect or "believe in" the possibility of unilateral sexual victimization of children by apparently normal adults.

The sexual abuse accommodation syndrome is derived from the collective experience of dozens of sexual abuse treatment centers in dealing with thousands of reports or complaints of adult victimization of young children.

In the vast majority of these cases the identified adult claimed total innocence or admitted only to trivial, well-meaning attempts at "sex education," wrestling, or affectionate closeness. After a time in treatment the men almost invariably conceded that the child had told the truth.

Of the children who were found to have misrepresented their complaints, most had sought to *understate* the frequency or duration of sexual experiences, even when reports were made in anger and in apparent retaliation against violence or humiliation.

Very few children, no more than two or three per *thousand*, have ever been found to exaggerate or to invent claims of sexual molestation [70].

It has become a maxim among child sexual abuse intervention counselors and investigators that children never fabricate the kinds of explicit sexual manipulations they divulge in complaints or interrogations [8].

The clinician with an understanding of the child sexual abuse accommodation syndrome offers the child a right to parity with adults in the struggle for credibility and advocacy.

Neither the victim, the offender, the family, the next generation of children in that family, nor the well-being of society as a whole can benefit from continuing secrecy and denial of ongoing sexual abuse.

The offender who protects an uneasy position. of power over the silent victims will not release his

control unless he is confronted by an outside power sufficient to demand and to supervise a total cessation of sexual harassment [13,22,25,32,71].

The counselor alone cannot expect cooperation and recovery in an otherwise reluctant and unacknowledged offender.

The justice system alone can rarely prove guilt or impose sanctions without preparation and continuing support of all parties within an effective treatment system. All agencies working as a team give maximum promise of effective recovery for the victim, rehabilitation of the offender and survival of the family [24,71].

The child sexual abuse accommodation syndrome provides a common language for the several viewpoints of the intervention team and a more recognizable map to the last frontier in child abuse.

## NOTES AND REFERENCES

1. ARMSTRONG, L. *Kiss Daddy Goodnight.* Hawthorn Books, New York (1978).
2. BURGESS, A., GROTH, A.N., HOLMSTROM, L. and SGROI, S. *Sexual Assault of Children and Adolescents.* Lexington Books, Lexington, N4A (1978).
3. BUTLER, S. *Conspiracy of Silence.* New Glide Publications, San Francisco, CA (1978).
4. FORWARD, S. *Betrayal of Innocence.* Tarcher, New York (1978).
5. GEISER, R. *Hidden Victims.* Beacon, Boston (1978).
6. MEISELMAN, K. *Incest.* Jossey-Bass, San Francisco (1978).
7. BRADY, K. *Father's Days.* Seaview Books, New York (1979).
8. MULDOON, L (Ed.). *Incest: Confronting the Silent Crime. Minnesota Program for Victim of Sexual Assault,* Saint Paul, MN (1979).
9. FINKELHOR, D. *Sexually Victimized Children.* Free Press, New York (1979).
10. JUSTICE, B. and JUSTICE, R. *The Broken Taboo. Human Sciences Press*, New York (1979).
11. SCHULT7, L. *The Sexual Victimology of Youth.* Charles C. Thomas, Springfield, EL (1979).
12. ALLEN, C. *Daddy's Girl.* Wyndham Books, New York (1980).
13. BULKLEY, J. and DAVIDSON, H. *Child Sexual Abuse Legal Issues and Approaches.* American Bar Association, Washington, D.C. (1980).
14. MacFARLANE, K., JONES B. and JENSTROM, L.(Eds.), *Sexual Abuse of Children: Selected Readings.* National Center on Child Abuse and Neglect, Office of Human Development Services, U.S. Department of Health and Human Services, Washington, D.C. (1980).
15. MRAZFK, P.B., and KEMPE, C.H. (Eds.), *Sexually Abused Children and their Families.* Pergamon, Oxford (1981).
16. RUSH, F. *The Best Kept Secret.* Prentice Hall, New York (1980).
17. SANFORD, L. *The Silent Children, A Parent's Guide to the Prevention of Child Sexual Abuse.* Anchor Press/Doubleday, New York (I 980).
18. ADAMS, C. and FAY, J. *No More Secrets.* Impact Publishers, San Louis Obispo, CA (1981).
19. BULKLEY, J. (Ed.). *Child Sexual Abuse and the law.* National Legal Resource Center for Child Advocacy and Protection, American Bar Association, Washington, D.C. (1981).
20. CONSTANTINE, L.L and MARTINSON, F.M. (Eds.), *Children and Sex.- New Findings, New Perspectives.* Little, Brown and Co., Boston (1981).
21. HALLIDAY, L. *The Silent Scream: The Reality of Sexual Abuse.* Sexual Abuse Victim Anonymous, R.R. No. 1, Campbell River, B.C., Canada V9W 3S4 (1981).
22. HERMAN, J.L. *Father/Daughter Incest.* Harvard University Press, Cambridge, MA (1981).

LAW OFFICE OF DENNIS A. LEMPERT   Telephone (408) 249-5152   Fax (408) 248-5974

**DEFENDANT'S OPPOSITION TO GOVERNMENT'S RELIANCE ON MR. CARL LEWIS AS ITS SOLE CSAAS EXPERT**

Page 20

23. BULKLEY,J.,(Ed). *Innovations in the Prosecution of Child Sexual Abuse Cases*. National Legal Resource Center for Child Advocacy and Protection, American Bar Association, Washington, D.C. (1982, 2nd Edition).

24. BULKLEY, J. *Recommendations for Improving Legal Intervention in Intrafamily Child Sexual Abuse Cases*. National Legal Resource Center for Child Advocacy and Protection, American Bar Association, Washington, D.C. (1982).

25. GIARRETTO, H. *Integrated Treatment of Child Sexual Abuse: A Treatment and Training Manual*. Science and Behaviour Books, Inc., Palo Alto, CA (I 982).

26. GOODWIN, J. *Sexual Abuse: Incest Victims and their Families*. John Wright PSG Inc., Littleton, MA (I 982).

27. LIST, S. *Forgiving*. E. P. Dutton, Inc., New York (1982).

28. MARTIN, L. and HADDAD, J. *We Have a Secret*. Crown Summit Books, Newport Beach, CA (1982).

29. MORRIS, M. *If I Should Die Before I Wake*. J.P. Tarcher, Inc., Los Angeles (1982).

30. O'BRIEN, S. *We Can! Combat Child Sexual Abuse*. College of Agriculture. The University of Arizona, Tucson (1982)

31. RICKS, C. *Carol's Story.-The Sin Nobody Talks About*. Tyndale House Publishers, Inc., Wheaton, IL (l992).

32. SGROI, S.M. *Handbook of Clinical Intervention in Child Sexual Abuse*. Lexington Books, Lexington, MA (1982)

33. *Social Work and Child Sexual Abuse*, Vol. l No.12, Journal of Human Sexuality and Social Work (l982).

34. ARMSTRONG, L. *The Home Front: Notes from the Family War Zone*. McGraw-Hill Book Co., New York (1983).

35. FINKFELHOR, D., *Sexual abuse: A sociological perspective*. Paper presented at the Third International Congress on Child Abuse and Neglect, Amsterdam (1981).

36. NOBILE, P., *Incest, the last taboo*. Penthouse December, pp. 117-118,126,157-158 (1977).

37. RAMEY, J., *Dealing with the last taboo*. Siecus Report VII(5):1-2, 6-7 (1979).

38. *Attacking the last taboo: Researchers are lobbying against the ban on incest*. Time, April 14:72 (1980).

39. DE MOTT, B., *The pro-incest lobby*. Psychology Today 13(10):11-16 (1980).

40. LEO, J. *Cradle-to-grave intimacy: Some researchers openly argue that "anything goes" for children*. Time Sept 7, pp. 69 (1981).

41. McMANMON, M.T. Personal communication (1979).

42. FINKELHOR. D., *Risk factors in the sexual victimization of children*. Child Abuse Neglect4:265-273(1980).

43. SUMMIT, R. and KRYSO, J., *Sexual abuse of children: A clinical spectrum*. American Journal of Orthopsychiatry. 48:237-251(1978).

44. GROTH, A.N., Patterns of sexual assault against children and adolescents. In: *Sexual Assault of Children and Adolescents*. A. Burgess, A.N. Groth, L. Holmtrom, and S. Sgroi (Eds.), Lexington Books, Lexington, N4A (1978).

45. GROTH, A.N. *Men who Rape. The Psychology of the Offender*. Plenum Press, New York (1979).

46. GROTH, A.N. and BIRNBAUM, B., *Adult sexual orientation and attraction to underage persons*. Archives of Sexual Behavior 7:175-181 (1978).

47. SUMMIT, R., Recognition and treatment of child sexual abuse. In: *Providing for the Emotional Health of the Pediatric Patient*, C. Hollingsworth (Ed.), Spectrum Publishers, New York (1983).

48. SUMMIT, R.C., Review of Herman J.L., *Father-Daughter Incest*. American Journal of Orthopsychiatry. 52:725-729 (1982).

49. GAGNON, I., *Female child victim of sex offenses*. Social Problems 13:176-192 (1965).

50. RUSSELL, D.E.H., *The incidence and prevalence of intrafamilial and extrafamilial sexual abuse of female children*. Child Abuse & Neglect 7:153-1461 (1983).

LAW OFFICE OF DENNIS ALAN LEMPERT   Telephone (408) 249-5152    Fax (408) 248-5974

1   51.   FINKELHOR, D., *What's wrong with sex between adults and children? Ethics and the problem of sexual abuse*. American Journal of Orthopsychiatry 49:692-697 (1979).
2   52.   MacFARLANE, K. Personal communication (1981).
    53.   BERLINER, L Personal communication(1981).
3   54.   Note: Classification of offenders and differential diagnosis of pedophilic behavior are beyond the scope of this article. In the present discussion of intra-family sexual abuse it is assumed that the intruder is acting within a regressive crisis and that he is not a practiced, habitual molester of children. See Groth [45] for further discussion.
5   55.   LANDERS, A., Sisters discover dad molested all five of them. Field Newspaper Syndicate, Chicago, IL May 21 (1980).
6   56.   SHENGOLD, L., *Child abuse and deprivation: Soul murder*. Journal of American Psychoanalytic Association 27:533-599 (1979).
7   57.   MYERS, B., Incest: If you think the word is ugly, take a look at its effects. In: *Sexual Abuse of Children: Selected Readings*, K MacFarlane, B. Jones and L. Jenstrom (Eds.), National Center on Child Abuse and Neglect, Office of Human Development Services, U.S. Department of Health and Human Services, Washington, D.C. (1980).
9   58.   LUSTIG, N., DRESSER, I.W., SPELLMAN, S.W. and MURRAY, T.B., *Incest: A family group survival pattern*. Archives of General Psychiatry 14:31-40 (1966).
10  59.   PETERS, L, *Children who are victims of sexual assault and the psychology of offenders*. American Journal of psychotherapy 30:398-412 (1976).
11  60.   ROSENFELD, A., *Sexual misuse and the family*. Victimology II(2):226-235 (1977).
    61.   RUSH, F., *The Freudian cover-up*. Chrysalis 1:31-45 (1977).
12  62.   ROSENFELD, A., NADELSON, C., and KRIEGER, M., *Fantasy and reality in patient reports of incest*. Journal of Clinical Psychiatry 40:159-164 (1979).
13  63.   BURGESS, A. and HOLMSTROM, L, *Rape trauma syndrome*. American Journal of psychiatry 131:981-986 (1974).
14  64.   BURGESS, A. and HOLMSTROM, L, *Sexual trauma of children and adolescents: Pressure, sex and secrecy*. Nursing Clinics of North America 10:551-563 (1975).
15  65.   BURGESS and HOLMSTROM, *Nursing Clinics of North America*. 10:562 (1975).
16  66.   DE MAUSE, L. (Ed.) *The History of childhood*. Psychohistory Press, New York (1974).
    67.   FREUD, S. In: *The Origins of Psychoanalysis*: Letters to Wilhelm Fliess, Drafts and Notes. 1987-1902. M. BONPARTF, A. FREUD, and E. KRIS, (Eds.) (Translated by E. Mosbacher and J. Strachey). Basic Books, New York. p. 217 (1954).
18  68.   KEMPE, C.H., SILVERMAN, F.N., STEELE, B.F., DROEGEMUELLER, W. and SIEVER, I., *The battered child syndrome*. Journal of the American Medical Association 18:17-24 (1962).
19  69.   SGROI, S., *Sexual molestation of children: The last frontier in child abuse*. Children Today 4:18-21, 44 (1975).
20  70.   GARRETT, H., Personal communication (1979).
21  71.   SUMMIT, R., Sexual child abuse, the psychotherapist and the team concept In: *Dealing with Sexual child abuse*, Vol. 2, H. Donovan and R.J. Beran (Eds.), National Committee for the Prevention of Child Abuse (1978).